**OLIN–MATHIESON CHEMICAL COR-PORATION, Cross-Plaintiff-Appellant**

v.

**ALLIS–CHALMERS MANUFACTURING COMPANY and I–T–E Imperial Corporation, Cross-Defendants-Appellees.**

No. 20521.

United States Court of Appeals,
Sixth Circuit.

Feb. 23, 1971.

Hugh E. Reynolds, Jr., Indianapolis, Ind., for appellant; Robert C. Hunt, Hunt & Bell, Chattanooga, Tenn., Locke, Reynolds, Boyd & Weisell, Indianapolis, Ind., on brief.

Silas Williams, Jr., Chattanooga, Tenn., for Allis Chalmers Manufacturing Co.; Spears, Moore, Rebman & Williams, Thomas S. Kale, Chattanooga, Tenn., on brief.

Fred M. Milligan, Chattanooga, Tenn., for I–T–E Imperial Corp.; Milligan, Hooper & Harris, Chattanooga, Tenn., on brief.

Before PECK and BROOKS, Circuit Judges, and McALLISTER, Senior Circuit Judge.

JOHN W. PECK, Circuit Judge.

This appeal presents the question of whether evidence of a malfunction of certain heavy electrical equipment was properly excluded by the trial judge, where the issue presented to the jury was concerned solely with liability resulting from a malfunction of similar equipment which occurred four months earlier.

Appellant Olin-Mathieson Chemical Corporation (hereinafter "Olin-Mathieson") operates a chemical fertilizer plant near Charleston, Tennessee. Prior to the time of the accident in question, the plant had been operating with five regulating transformers manufactured by Westinghouse Electric Corporation. In 1967 Olin-Mathieson contracted with appellee I–T–E Imperial Corporation (hereinafter "I–T–E") to furnish it with three new electrical lines, including three new transformers and associated electrical equipment, together with any engineering services necessary for installation. I–T–E then purchased the three transformers needed for the job from appellee Allis-Chalmers Manufacturing Company (hereinafter "Allis-Chalmers"). Although most of the work of installation was accomplished by various subcontractors, Olin-Mathieson assumed the responsibility of supervision for the work required at its plant.

On June 21, 1968, the job had reached the final testing stage and Olin-Mathieson was attempting to bring the three new units up to full electrical load for the first time, when a massive arc occurred on Unit No. 7 transformer, causing burning oil to erupt, damaging some of the equipment. Two employees who had been working on the equipment were killed.

On November 16, 1968, the second malfunction occurred on Unit No. 7 and a major arc resulted. However, the damage from this incident was much less extensive. Only a limited amount of oil erupted through a release valve, and the length of time needed to repair the equipment was considerably less.

The widow of one of the deceased employees from the June incident brought a wrongful death action against the three parties herein and one of the subcontractors. Olin-Mathieson then cross-claimed against I–T–E on theories of negligence, strict liability and breach of express and implied warranties on the contract and against Allis-Chalmers on similar products liability theories, including negligence. The cross-claim was for recovery of property damages, which Olin-Mathieson sustained as a result of both the June and November incidents. A few days prior to the trial, the claims of the widow were settled out of court. The case then went to trial on the issue of liability for the June occurrence only, it being agreed by the parties that the issues of damages and of the November occurrence would be decided in separate trials. The jury returned a verdict against Olin-Mathieson. A motion for a new trial was made based principally on the exclusion of evidence of the November incident. The motion was denied by the trial judge and this appeal followed.

■ The jury in the District Court was subjected to a highly complex and technical set of facts, presented through evidence over a period of six days and involving the opinions of many witnesses offered as experts in related fields of engineering. Much of the testimony and the other evidence was offered to prove one critical element, the cause of the malfunction in the June incident. It was primarily for this purpose that Olin-Mathieson sought to introduce evidence of the November incident and thus we have been required to examine the very complicated facts to determine whether an abuse of discretion occurred.

For purposes of illustration, the function and operation of Olin-Mathieson's transformer units can be compared to that of a toy electric train. As the control arm on such a train transformer is moved up or down, the voltage sent to the train increases or decreases respectively, changing its speed. Similarly, at Olin-Mathieson, as a signal is sent from a remote control room to a transformer located some distance away, the transformer functions to increase or decrease the voltage in an electrical line, making the same input current suitable for various designed industrial purposes.

Mounted on the side of each transformer is a board, oriented like the numbers on the dial of a clock, with two arms or "tap changers" indicating the voltage of the transformers. Functionally, these tap changers perform a service similar to that of the arm on the toy train transformer. One tap changer is for fine changes and the other for coarse changes. When the operator in the control room initiates a change, the signal is transmitted to the tap changers through certain relays, including four relays located on a control box on the side of the transformer. The relays function simply to pass the signal on to the tap changers. Once the signal is received, the transformer itself then determines what positions on the tap changers will produce the desired result, and automatically motors in the unit move the tap changers to the new positions.

If the arm of the fine tap changer is moved to a different position, which requires a previous connection on the board to be severed, it draws an arc which is acceptable electrically, because current flowing through that connection is relatively low. On the other hand, the course tap changer for Olin-Mathieson's five older units was never permitted to be moved while under load, because a major arc would be produced upon the severance of the connection.

The Allis-Chalmers' transformers were different, however, in that the coarse tap changers on their units could be moved to a different position while under load when the fine tap changer was in certain specified positions. To accomplish this, Allis-Chalmers added a switch to the coarse tap changer mechanism, called the "odd-even" switch, which prevented the coarse tap changer from making any changes while under load if the fine tap changer was not in one of the specified permissible positions. Following a permissible change

to a different voltage, the new positions of the tap changers are displayed on position indicators supplied by Allis-Chalmers.

As might be expected, there are safety devices in the unit, designed to signal circuit breakers when a malfunction occurs and relieving the unit of its electrical load as quickly as possible. These devices are known as "protective relays" and they normally function on a source of power separate from the unit itself, once they sense that a malfunction has occurred in the unit. I–T–E, however, as part of its contractual obligation, drew up a schematic diagram for Olin-Mathieson, indicating that the "protective relays" were to be powered on AC current, rather than an independent source of DC current. This was improper as counsel for I–T–E and one of its employees admitted during the trial. As a result, an inordinate amount of time passed before the malfunction of the unit in the June incident was cleared.

This leads us to the day in question, when Olin-Mathieson was trying to bring Unit No. 7 and the two other transformers up to full load for the first time. An Olin-Mathieson employee was in the control room and observed that Unit No. 7 would neither increase nor decrease its load with the others. After trying it several times, he called for help and an Olin-Mathieson engineer came to investigate the trouble. First, the engineer worked behind the control panel, but with no results. He then left the control room and returned in five or ten minutes and asked the operator to try it again. There was still no change. Finally, the engineer and an employee of one of the subcontractors, went out to the transformer. Shortly thereafter, the massive arc, which sounded like an explosion, occurred, killing the two men and damaging the equipment.

No one had touched the controls in the control room prior to the explosion. An inspection near the transformer revealed that the control box door on the side of Unit No. 7 had been opened and several relay covers, including the "coarse raise" and "coarse lower," had been removed. There was a large print supplied by Allis-Chalmers lying open in the area and a stepladder, a volt testing device and miscellaneous electrician's equipment were found nearby. Testimony tended to show that prior to the explosion, the position indicator for Unit No. 7 showed a tap position of fine 3, coarse 11, which is permissible. Further testimony tended to show that after the explosion, the indicator showed a position of fine 3, coarse 10, which is not permissible.

The transformer was later opened up and inspected, but no one was ever able to determine the nature of the malfunction which led to the explosion. The odd-even switch, the coarse tap changer itself, and some of the relays including the relays on the control box were tested and appeared to be operating properly, though part of the equipment was damaged too badly for testing.

Evidence of the November failure is, we believe, in marked contrast to that of the June incident on several important points. It is true that the malfunction in November occurred on Unit 7 transformer. However, the transformer and its equipment had been completely remanufactured and had been operating normally since September 15, 1968. The testimony indicated that the malfunction occurred just after an operator in the control room had made a routine adjustment on the unit. He then stepped back and heard the explosion.

No one was near the unit, much less working on it at the time of the explosion in November. The positions of the tap changing mechanisms in the November incident were different, and although evidence indicated that the size of the arc on both occasions was about the same, the locations of the arcing on the tap changing mechanisms for each incident were different.

Olin-Mathieson makes three arguments on this appeal to support its contention that evidence of the November incident was erroneously excluded by the

District Judge. First it argues that the circumstances of the November incident were of probative value in establishing an inference that the failure of the unit in June resulted from an electrical or mechanical malfunction. We disagree.

In the first place, the weight of the testimony on the November incident indicated that the explosion was caused when a pin dropped out of the odd-even switch, which permitted the coarse tap changer to make an impermissible change, resulting in the explosion. No such facts were shown relating to the June incident.

Olin-Mathieson urges a different theory as to causation, however, and it is this theory which it claims gives relevance to evidence of the November occurrence. At the trial, one expert witness expressed the opinion that faulty supporting equipment for the unit had fractured and caused misalignment and jamming of the coarse tap changer mechanism, which in turn caused the malfunction. Because the supporting equipment, including the board which supported the tap changer mechanism, was found similarly fractured after the June incident, Olin-Mathieson contended that the evidence should go to the jury to permit them to draw the inference that the June incident was likewise caused by an electrical or mechanical malfunction.

It is clear from the testimony in the record, however, that no other witness was of the opinion that the results of the November incident permitted the inference that an electrical or mechanical malfunction caused the June incident. Moreover, the only witness stating this opinion, did so as follows:

"Q. Based upon the extent of the damage in June and based upon your investigation in November and the fact that there is at least certain similarity in the unit, do you feel that you can definitely rule out the possibility of a mechanical or electrical malfunction having caused the June incident?

"A. If you mean by that a hundred percent certainty, no."

An employee of Olin-Mathieson, who was called by Olin-Mathieson as an expert witness, was asked to similarly relate the facts of the November incident to the cause of the June incident. He said, " * * * I don't really know what started the [June] incident", a significant response in present context since he further testified that the November failure was the result of a mechanical malfunction. He also conceded that the results of the November incident were consistent with the assertion that it was caused by a pin dropping out of the odd-even switch.

Thus, not only was Olin-Mathieson unable to sufficiently relate its theory as to causation to the June incident, but it was even more hard-pressed to overcome the evidence indicating that the November incident was the result of a pin dropping out of the odd-even switch. We conclude, therefore, that if the District Court judge had permitted evidence of the November incident, the jury would have been presented with a multitude of collateral issues. A great deal more technical evidence would have become relevant, prolonging the trial unnecessarily and creating a high probability of confusion of the issues.

Olin-Mathieson's second argument contends that the November incident was admissible to support its assertion that the failure of the protective devices after the malfunction occurred materially increased the damage in June, and to refute any assertions to the contrary by I–T–E. Since the question of damages was not at issue, such proof would have been without relevance. The jury had before it evidence of the failure of the protective devices as bearing on the issue of liability. Had a verdict been returned against I–T–E, the difference in damages between the two incidents would have been of probative value on the question of what amount of damages was attributable to I–T–E. We believe that any possible benefit was out-

weighed by the considerations of the undue prolongation of the trial and confusion of issues which would have accompanied receipt of this evidence.

■ In Olin-Mathieson's third argument, it states that the appellees introduced evidence of related incidents other than the November incident and thereby waived their right to object to admission of the November evidence. Olin-Mathieson did not object to the introduction of this other evidence. In its argument to this court, Olin-Mathieson stated that it refrained from so objecting because it considered this evidence fully competent and relevant. Obviously, however, the admission of competent evidence does not render admissible evidence which is otherwise incompetent.

The question as to whether Rule 43(a) of the Federal Rules of Civil Procedure renders the above evidence admissible remains. Rule 43(a) makes any evidence admissible which is admissible under: (1) United States statutes; (2) pre-existing rules of the United States equity courts; or (3) state rules of evidence. Grossman v. United States Slicing Machine Co., 365 F.2d 687, 689 (3rd Cir. 1966). The Tennessee rules thus become pertinent.

In turning to Tennessee law, Olin-Mathieson has cited cases in which the plaintiff was injured from an exploding soft drink bottle and the trial court was found to be in error when it excluded evidence of other similar incidents. Graham v. Cloar, 30 Tenn.App. 306, 205 S.W.2d 764 (1947); Winfree v. Coca-Cola Bottling Works, 19 Tenn.App. 144, 83 S.W.2d 903 (1935). Appellant also cites Louisville & Nashville Ry. Co. v. Short, 110 Tenn. 713, 77 S.W. 936 (1903), where evidence of other instances of locomotives causing fires was admitted to prove the negligence of defendant when its locomotive was accused of causing the fire in question.

■ In the soft drink explosion cases, however, the evidence was offered either to prove the dangerous character of the instrumentality or to show that the defendant had notice of the particular danger or defect. The evidence in *Short* was offered to show the improper construction or negligent operation of the locomotives. Olin-Mathieson was attempting to introduce the evidence in this case as proof of the cause of the June incident. It has long been held that evidence of other occurrences is inadmissible as evidence of the cause of a specific occurrence. *See* 38 Am.Jur. § 314. Moreover, Tennessee law has followed the principle that where evidence of similar occurrences is outweighed by considerations of the likelihood of misleading the jury and confusing the issues, such evidence is inadmissible, especially where many collateral issues having no relevance to the facts in question would thereby be admitted. Lewisburg & Northern Ry. v. Minton, 7 Tenn.Civ. App. 71, 84–85 (1916).

■ Under federal law, we can find no authorities supporting the contention of Olin-Mathieson that the trial judge was required to admit the evidence in question. There can be no doubt that Rule 43(a) envisions a greater leniency toward the admissibility of evidence, which this court has recognized. United States v. 1,291.83 Acres of Land, 411 F. 2d 1081 (6th Cir. 1969); Teti v. Firestone Tire & Rubber Co., 392 F.2d 294 (6th Cir. 1968). However, this court also vests the trial judge with broad discretion over the admissibility of evidence, especially where the case is tried before a jury. Bridger v. Union Ry. Co., 355 F.2d 382 (6th Cir. 1966); *see* United States v. 1,291.83 Acres of Land, *supra.*

Reference to the Proposed Rules of Evidence for the United States District Courts and Magistrates, 46 F.R.D. 161 (1969) seems appropriate. Rule 4–03 thereof states:

"Rule 4–03, Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time.

(a) Exclusion Mandatory. Although relevant, evidence is not admissible if its probative value is sub-

stantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading of the jury." 46 F.R.D. at 225.

The rule makes exclusion of evidence such as that in the present case not merely discretionary, but mandatory. The note under the rule explains that the probative value of evidence must be weighed against the harm likely to result from its admission. It was within the spirit of this section that the trial judge made his ruling, and we find no error in his decision.

Affirmed.